**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JALINSKI ADVISORY GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4: 19 CV 1914 DDN |
| | ) | |
| JBL FINANCIAL SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER

This matter is before the Court on:

(1)     the motions of defendant JBL Financial Services, Inc. for summary judgment (Docs. 89, 90, 91, 93);

(2)     the motions of defendant to bar the testimony and opinions of certain of plaintiff's experts (Docs. 74, 78, 80);

(3)     the motion of plaintiff Jalinski Advisory Group, Inc. (JAG) to amend its amended complaint (Doc. 123); and

(4)     the motion of defendant to strike and exclude for sanctions certain exhibits submitted by plaintiff (Doc. 130).

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 1114 and 1125.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).  The Court heard argument on the motions on February 9, 2022.

## BACKGROUND

The following facts are uncontroverted by the parties, unless otherwise noted.  Plaintiff JAG is a New Jersey corporation providing insurance products; Wealth Quarterback, a corporation affiliated with plaintiff, provides investment advisory services.  (Plaintiff Jalinski Advisory Group, Inc., and Defendant JBL Financial Services, Inc.'s First Amended Joint Statement of Contested and Uncontested Material Facts ¶¶ 1g, 1i, 113a (hereinafter SOF ¶ __)).  Plaintiff began using the

marks "Financial Quarterback" or "The Financial Quarterback" in reference to its services at least as early as 2006. SOF ¶ 136a. Plaintiff is the owner of the trademark "The Financial Quarterback" and "Financial Quarterback" under four different registration numbers: 4722740, 5346563, 5633102, and 5346562. SOF ¶¶ 17a-b. Plaintiff is also the owner of the "The Financial Quarterback" trademark under registration number 3782665, which is identified by the U.S. Trademark Office as being "cancelled" and "dead" due to plaintiff's voluntary abandonment of the registration. SOF ¶¶ 18-20a. Plaintiff and Wealth Quarterback have never had a written trademark license agreement, and Wealth Quarterback does not pay plaintiff for use of the mark. SOF ¶ 126a.

Plaintiff generates most of its client leads through radio programs, podcasts, television appearances, seminars, social media marketing, and other appearances by plaintiff's president and owner, Josh Jalinski. SOF ¶¶ 16, 94f. Mr. Jalinski's radio program, entitled "The Financial Quarterback," is terrestrially broadcast in portions of New York, New Jersey, Connecticut, and Pennsylvania. SOF ¶ 31a. The radio program has also been available nationally via internet streaming since October 2008. SOF ¶¶ 33r, 34c, 75a. Its territorial reach includes New York, New Jersey, Pennsylvania, the Midwest, Washington, D.C., North Carolina, Virginia, Massachusetts, Vermont, and Maine. SOF ¶ 111k. Plaintiff also has a substantial presence on Facebook and other social media sites, which have been a large source of leads in recent years. SOF ¶ 175c.

Defendant is a St. Louis-based entity providing a variety of financial and retirement planning and advisory services, which it promotes using the term "Retirement Coach." SOF ¶¶ 35, 41 60a, 60c, 61a. Since as early as December 1, 2004, defendant has used "Retirement Coach" in its newsletter, "The Coach's Corner." SOF ¶ 60a. Defendant has also been using the term "Retirement Coach" in its radio program, "Straight Talk on Retirement," since May 2006. SOF ¶ 61a. Defendant's radio program is terrestrially broadcast in eastern Missouri and central Illinois, and it has been available via internet streaming since 2007. SOF ¶¶ 61b, 62a. Defendant also uses the word "coach" and phrase "Retirement Coach" frequently when posting on social media. SOF ¶¶ 181a, 182a.

In 2015, defendant received a cease-and-desist letter from the owner of the mark "The Retirement Coach," registration number 247023. SOF ¶ 166a. According to defendant's president, Jeff Lapidus, Mr. Lapidus and the owner of the mark agreed that they operated in

different geographic areas such that there was no likelihood of confusion.  SOF ¶ 167a.  There is no evidence that defendant received a license to use the mark "The Retirement Coach," but it continues to use it as it had before it received the cease-and-desist letter.  SOF ¶¶ 167c, 168a.

In July 2017, defendant hired a third party, FMG Suite, to update its website; in the process, FMG Suite added "financial quarterback" and "quarterback" into the content of the website.  SOF ¶ 177a.  Plaintiff identified multiple uses of "financial quarterback" by defendant on defendant's website and social media pages, in close proximity to links to and/or advertisements for defendant's newsletter and radio program.  SOF ¶¶ 71b, 174b.  In May 2017, defendant posted the following message on Facebook: "We pride ourselves on always simplifying complex terms into understandable terminology to come up with a game plan that works for you! #finance #retirement #quarterbacks #gameplan #coachingsession." (Doc. 124-36 at 2.)  In April 2018, defendant posted messages on Facebook and Twitter that each included the sentence "We pride ourselves on being your financial quarterbacks!" (*Id*.)  These three social media posts, as well as three posts from March 2018 that did not include the words "financial" and/or "quarterback," include an image of a football team.  (*Id*. at 2-6.)  Screen captures from defendant's website as of October 2016 and July 2017 show that the defendant described itself as "coach, quarterback, and adviser" for its clients.  (Doc. 124-5 at 3; Doc. 124-20 at 3; Doc. 67-4 at 4.)  Additionally, screen captures from October 2017, April 2018, and January 2019 show that defendant's website included the phrase "We pride ourselves on being your financial quarterbacks."  (Doc. 67-4 at 1-3.)

Defendant learned of the use of "financial quarterback" on its website on July 13, 2019, after plaintiff filed this action.  SOF ¶ 178a.  Defendant removed the phrase "financial quarterback" from its website on July 15, 2019.  SOF ¶ 80a.  Plaintiff has not identified an instance wherein defendant used "Financial Quarterback" or "The Financial Quarterback" in defendant's newsletter or radio program.  SOF ¶ 174a.  There is no evidence that defendant was aware of plaintiff prior to the filing of this action.  SOF ¶ 147a.

Plaintiff has one client in Missouri but states that it has received calls from potential clients located in Missouri.  SOF ¶¶ 81, 82a.  Defendant serves some clients in states where plaintiff has a presence, including Texas and Florida; however, the majority of its clients reside in Missouri and Illinois.  SOF ¶¶ 85, 87b.  Plaintiff has not identified any actual confusion or lost leads due to defendant's use of the phrase "Retirement Coach."  SOF ¶¶ 93a, 94a.

Plaintiff claims trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1) (Counts 1-4); unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Counts 5-8); common law trademark infringement and unfair competition (Count 9); and Missouri state law claims of unfair trade practices and trademark dilution (Counts 10-11).

Defendant counterclaims for declaratory judgments of non-infringement and regarding plaintiff's rights to the mark "Financial Quarterback" (Counts 1-5); unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) (Count 6); state law claims of trademark dilution, unfair trade practices, and injury to business reputation (Count 7); and cancellation or restriction of plaintiff's asserted trademark registrations (Counts 8-9).

## MOTIONS TO BAR EXPERT TESTIMONY

Federal Rule of Evidence 702 allows a witness who qualifies as an expert by knowledge, skill, experience, training, or education to testify in the form of an opinion or otherwise about scientific, technical, or other specialized knowledge. Fed. R. Evid. 702. Expert opinion testimony must pass threshold standards of reliability and relevance. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The inquiry of Rule 702 is a flexible one, *id.* at 594 n. 12, but the *Daubert* court identified five important considerations relevant in determining whether these standards are met.

First, the evidence must be scientific, technical, or otherwise specialized. Fed. R. Evid. 702. Opinion evidence is "scientific" if it is grounded in the methods and procedures of science. *Daubert*, 509 U.S. at 589-90. Second, the evidence must be "knowledge" and not mere "subjective belief or unsupported speculation." *Id*. at 590. This means that the subject of scientific testimony must be derived by the scientific method. *Id.* Third, Rule 702 requires that the evidence be relevant in the sense that it is helpful to the trier of fact to decide a fact at issue. *Id.* at 591, 592. Fourth, if the expert opinion is based on evidence that is inadmissible, the opinion may be admitted only if this evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." *Id.* at 595 (citing Fed. R. Evid. 703). Fifth, the trial court must determine whether the expert's reasoning and methodology are reliable, *i.e.*, (a) whether they can be and have been tested; (b) whether they have been submitted to peer review and publication; (c) whether the asserted scientific technique has a known or potential rate of error;

and (d) whether the asserted technique is generally accepted in the scientific community.  *Id.* at 593-94.

These can be summarized in Rule 702's post-*Daubert* amendment, which requires expert evidence be (a) such that it "will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "based on sufficient facts or data;" (c) "the product of reliable principles and methods;" and (d) an application of "the principles and methods to the facts of the case."  Fed. R. Evid. 702 (2011).  The Eighth Circuit has identified further factors that are relevant in determining reliability: the extent to which an opinion was developed for litigation as opposed to naturally flowing from an expert's research and the extent to which the proposed expert eliminated alternative explanations in reaching his or her conclusions.  *See Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (citing *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681 (8th Cir. 2001).

The proponent of the expert evidence must show that it is reliable and would be helpful to the finder of fact, and that the expert is qualified to be a witness under Rule 702.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory-committee's note.  The expert must explain how he developed his opinions.  Fed. R. Evid. 702 advisory-committee's note.  An expert's opinion is subject to being rejected if it is substantially based upon the expert's subjective belief or unsupported speculation.  *Estate of Claison L. Groff v. Aquila, Inc.*, 2007 WL 4644707, at *9 (S.D. Iowa 2007) (*e.g.,* ruling expert opinion not admissible as unsupported and speculative regarding size of natural gas leak and that the hole through which the gas escaped "could have or must have closed during shipment of the furnace").

While the district court focuses on an expert's principles and methodology, expert conclusions may also factor into the admissibility calculus.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  A court may conclude that there is "simply too great an analytical gap" between a proffered opinion and the data in a case, and it is within the court's discretion to conclude that data relied upon is not sufficient to support an expert's conclusions.  *Id.*  A court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Id.*  And, finally, "expert testimony on legal matters is not admissible.  Matters of law are for the trial judge[.]"  *See Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003)  (citations omitted).

**Rob Wallace**

Defendant argues that Mr. Wallace erroneously surveyed persons ranging from 18 to 65 years of age, while the actual consumer base of the parties was identified as those 50 years of age or older.  (Doc. 75 at 5.)  It contends that Mr. Wallace's methods are not the product of reliable principles and methods and that the survey was presented in a confusing and ambiguous manner.  (*Id*. at 6.)  It argues that the survey failed to use the webpage and social media posts and includes leading language.  (Doc. 74 at ¶¶ 16, 19.)  Lastly, defendant argues that Mr. Wallace made inappropriate conclusions of fact and law, including that actual confusion exists, and that his conclusions are not supported by the survey results.  (Doc. 75 at 6-7.)

Plaintiff responds that Mr. Wallace has decades of experience in the branding industry and in consumer survey and research projects, including as an expert in branding-related issues in multiple litigation matters.  (Doc. 122 at 4.)  It argues that Mr. Wallace's survey showed 35 percent of qualified respondents believed that the podcast, social media, and website communications tested came from the same source and that 57.5 percent of respondents believed they came from the same or affiliated sources.  (*Id*. at 5.)  Plaintiff contends that Mr. Wallace's conclusions as to likelihood of confusion are grounded in the survey results and case law cited in his report and that Mr. Wallace did not erroneously conflate actual confusion and likelihood of confusion.  (*Id*. at 5-6.)  Plaintiff also argues that the age range for the survey was appropriate, as consumers under the age of 50 are interested in retirement products and potential survey respondents answered "yes" to the questions of whether they had listened to radio programs, podcasts, or online programming about financial planning within the prior 12 months.  (*Id*. at 6.)  Lastly, plaintiff responds that the first survey exposed respondents to the terms "The Financial Quarterback" and "The Retirement Coach," which are prominently displayed on the parties' websites; that the second survey exposed respondents to screen shots from both parties' websites; and that the survey language was not "leading."  (*Id*. at 7.)

In reply, defendant argues that Mr. Wallace's report and testimony should be excluded because the individual flaws of the survey and report, when combined, result in an unreliable opinion.  (Doc. 131 at 9-10.)  It contends that Mr. Wallace failed to consider third-party ownership and uses of "quarterback" by entities offering financial services, as well as that "The Retirement Coach" has been found to be merely descriptive.  (*Id*. at 8.)  It also argues that Mr. Wallace did not provide an opinion as to initial interest confusion and failed to take significant facts into

consideration.  (*Id*. at 8-9.)  In the alternative to exclusion of the entire report and testimony, defendant argues that the legal conclusions made by Mr. Wallace should be excluded.  (*Id*. at 10.)

Mr. Wallace has more than 30 years of experience in brand identity and marketing and has served as an expert witness on branding-related issues on more than 70 occasions, including in the area of intellectual property infringement.  (Doc. 126-4 at 2, 3.)  In designing the survey, Mr. Wallace reports that he relied on the principles and standards in the *Reference Manual on Scientific Evidence* (3d ed. 2011), MANUAL FOR COMPLEX LITIGATION (FOURTH) (2004), and *Reference Guide on Survey Research* (2011).  (*Id*. at 5-6.)

As stated above, "expert testimony on legal matters is not admissible."  *See Southern Pine Helicopters, Inc.*, 320 F.3d at 841.  Mr. Wallace may not opine any legal matters, including whether the results of the survey meet the legal standard for likelihood of confusion.  Other than the excluded legal conclusions, the cited deficiencies in Mr. Wallace's report do not justify exclusion under Rule 702.  He has specialized knowledge that will help the trier of fact to understand the evidence.  His testimony is based on sufficient facts and is the product of reliable principles to which he applied the facts of the case.  Any question raised by his methodology goes to the weight and not admissibility of his testimony.

Accordingly, Rob Wallace is not excluded as an expert witness.

### Josh Jalinski

Defendant argues that Mr. Jalinski's bias disqualifies him as an expert as to damages.  (Doc. 79 at 4.)  It contends that his opinion is not the product of reliable principles and methods and that his conclusions are speculative and unsupported by the facts.  (*Id*. at 4, 7.)  Defendant lastly argues that Mr. Jalinski's report should be excluded because plaintiff did not timely identify him as an expert witness under Rule 26(a)(2)(A).  (*Id*. at 9.)

Plaintiff argues that the presumed bias of Mr. Jalinski is not a bar to his expert testimony and that any perceived bias may be addressed during cross-examination.  (Doc. 124 at 13.)  It asserts that Mr. Jalinski properly formed his opinion based on "basic math" and the "10-3-1" industry standard for converting leads to clients.  (*Id*. at 9.)  It contends that lack of general acceptance of Mr. Jalinski's methods would not be a bar to admissibility under *Daubert*.  (*Id*. at 15.)  Plaintiff argues that Mr. Jalinski's testimony may be admissible, at least in substantial part, as an opinion by a lay witness under Fed. R. Evid. 701.  (*Id*.)  It contends that the criticisms of Mr.

Jalinski's report by defendant's rebuttal witness, Mark E. Hoffman, relate to the assumptions and factual foundations of Mr. Jalinski's report, which impacts the credibility but not admissibility of the report.  (*Id*. at 16.)  Lastly, plaintiff asserts that defendant was not prejudiced by plaintiff's late identification of Mr. Jalinski as an expert, as defendant had opportunity to depose Mr. Jalinski about his expert opinions; defendant was able to produce a rebuttal report by its own expert; and defendant knew early on that Mr. Jalinski was a fact witness.  (*Id*. at 18.)

In reply, defendant argues that Mr. Jalinski's report, if proffered as that of a lay witness under Fed. R. Evid. 701, was untimely provided after the close of discovery and should be excluded.  (Doc. 131 at 10.)  It contends that the styling of Mr. Jalinski's report as that of an expert witness disqualifies its use as that of a lay witness under Fed. R. Evid. 701(c).  (*Id*. at 11.)  Lastly, defendant argues that Mr. Jalinski failed to consider that the St. Louis financial services market is highly competitive and incorrectly assigned all of plaintiff's supposedly lost leads to defendant.  (*Id*. at 12.)

Mr. Jalinski's education includes a bachelor's degree in history and a master's degree in religion, and he has over a decade of experience in the financial services and radio broadcasting industries.  (Doc. 126-8 at 3.)  In his report, he does not discuss specifically any principles or methods used to calculate damages.  To calculate plaintiff's loss of leads, he reviewed plaintiff's records of calls and appointments.  (*Id*. at 4-5.)  To calculate plaintiff's conversion ratio of leads to clients, he used historical data from plaintiff's client relationship management records.  (*Id*. at 5-6.)  He also used historical data to determine assets under management per client.  (*Id*. at 6-7.)  To calculate plaintiff's total damages, Mr. Jalinski multiplied the number of lost clients by the lost revenue per client; he then subtracted operating costs and client attrition.  (*Id*. at 7-8.)  In summary, in making his calculations, Mr. Jalinski relied on plaintiff's historical client data and multiplication, division, and subtraction.

There is no implicit requirement in Rule 702 that a proffered expert make complicated mathematical calculations.  *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011); *see also Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F.Supp.3d 745, 755 (S.D. Iowa 2019) (holding that expert witness's simple mathematical calculations were admissible because they relied on a substantial amount of disparate, potentially confusing sources of data and were likely to help the jury in making sense of the calculations).  Mr. Jalinski's

calculations were based on a substantial amount of disparate data, and they are likely to help the jury in making sense of the damages claimed by plaintiff.

Because Mr. Jalinski's report and testimony are admissible under Rule 702, they are inadmissible under Rule 701, pursuant to Rule 701(c). Rule 701(c) limits lay witness testimony to that which is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Mr. Jalinski's testimony as to damages is therefore limited to that of an expert under Rule 702.

"[A]n expert witness need not be unbiased for his or her testimony to be admissible." 4 Weinstein's Fed. Evid. § 702.04[5]. "Determining the credibility of a witness is the jury's province, whether the jury is lay or expert." *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000). Evidence of bias may be drawn out during cross-examination. *Id*. The Court will allow the jury to determine the credibility of Mr. Jalinski's report and testimony.

A party is required to disclose the identity of any expert it may use at trial to present evidence under Rule 702. Fed. R. Civ. P. 26(a)(2)(A). Such disclosure must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). If the witness is not required to provide a written report, the disclosure must state the subject matter upon which the expert is expected to present evidence and a summary of the facts and opinions to which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(C). "If a party fails to disclose information or identify a witness as required by Rule 26(a) or (e), the party shall not be permitted to use [the nondisclosed information as] evidence on a motion, at a hearing, or at trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Plaintiff does not dispute that Mr. Jalinski's participation as an expert was untimely disclosed. Rather, it argues that he was not required to produce a report because he was not retained to provide expert testimony, and his duties do not regularly involve giving expert testimony. Plaintiff should have disclosed Mr. Jalinski's participation as an expert witness under Rule 26(a)(2)(C). However, the Court finds that the failure is harmless. Defendant argues that it was prejudiced by Mr. Jalinski's report, but it does not identify any specific harm due to plaintiff's failure to disclose. Defendant's expert, Mark Hoffman, produced a rebuttal report that addressed

Mr. Jalinski's conclusions on April 22, 2021, two weeks after plaintiff produced Mr. Jalinski's report.  (Doc. 126-11.)

For the foregoing reasons, the Court denies defendant's motion to exclude the report and testimony of Mr. Jalinski.

### *Robert Gering*

Defendant argues that the opinions in Mr. Gering's report as to damages are not supported by independent analysis or evaluation but rather depend on the unreliable report by Mr. Jalinski. (Doc. 81 at 4-5.)

Plaintiff contends that Mr. Gering's report appropriately relied on Mr. Jalinski's particularized knowledge and analyses of plaintiff's lead generation rates, conversion rates, and associated revenues and profits.  (Doc. 122 at 18-19.)  It argues that Mr. Gering also independently reviewed documents produced by both parties, the transcript of Mr. Jalinski's deposition, and the parties' respective websites, as well as meeting with Mr. Jalinski and plaintiff's compliance officer.  (*Id*. at 19.)  Lastly, it contends that Mr. Gering has 20 years of experience in economic modeling and statistical analyses related to calculation of lost profits and other damages in intellectual property infringement disputes.  (*Id*.)

In reply, defendant argues that Mr. Gering failed to perform his own analysis or consider significant facts in producing his report, including that the St. Louis financial services market is competitive and that plaintiff was not licensed to do business in Missouri or Illinois during the relevant period.  (*Id*. at 13.)  Defendant contends that Mr. Gering's assertion that "[d]amages are quantified as the lost profits" is speculative because he has not performed his own analysis of damages or lost profits and has not considered alternative methods, including those used by defendant's own expert.  (*Id*. at 14.)

Mr. Gering has more than 20 years of experience in antitrust, patent infringement, royalty rate calculations, breach of contract, and lost profit disputes.  (Doc. 126-7 at 8.)  He has been deposed as an expert in four other federal court matters within the last five years, and he has given presentations throughout his career regarding lost profit damages in intellectual property.  (*Id*. at 9-13.)  In preparing his report, he reviewed documents filed with the Court, document production from both parties, the parties' respective websites, and plaintiff's financial information.  (*Id*. at 2-3.)  He also met with Mr. Jalinski and Tom Clancy, plaintiff's compliance officer.  (*Id*. at 3.)

Mr. Gering determined that the most appropriate measure of damages was plaintiff's lost profits from lost leads due to the importance of leads in the financial services industry. (*Id*. at 5.) He relied on plaintiff's internal analysis for the calculations in his report. (*Id*. at 5-6.)

From the face of his report, it does not appear to the Court that Mr. Gering completed any independent analysis of the facts of the case. While he states that he independently reviewed other documents, he admittedly relies on Mr. Jalinski's analysis and plaintiff's internal data, including plaintiff's conversion rate and expected rate of leads per week. He does not reference any other documents or facts in his analysis. Unlike in Mr. Jalinski's opinion, Mr. Gering did not independently cull the data to make the appropriate calculations, and he did not analyze the data using any apparent principles or methods. *See Mahaska Bottling*, 441 F.Supp.3d at 755. Instead, he relied on and repeated Mr. Jalinski's conclusions as to the conversion rate and expected lead generation. The Court will therefore exclude Mr. Gering's report and testimony.

## MOTION TO AMEND

The Court next addresses plaintiff JAG's motion to amend its first amended complaint to add Wealth Quarterback as a plaintiff. (Doc. 123.)

Plaintiff argues that Wealth Quarterback has always been a part of the present litigation as a division and integrated component of JAG. (Doc. 123-1 at 10.) It contends that the record establishes that JAG and Wealth Quarterback share common ownership; are both controlled by Josh Jalinski; have overlapping representatives that provide insurance and investment advisory services; and share a phone number, employees, and office space. (*Id*.) It also argues that JAG and Wealth Quarterback each use "The Financial Quarterback" trademarks and share the costs of producing and advertising the radio program. (*Id*.) Lastly, it asserts that both plaintiff and defendant have treated Wealth Quarterback as a party throughout the present litigation. (*Id*. at 8.)

Defendant asserts that plaintiff admitted in a May 2020 request for admission that Wealth Quarterback is not a plaintiff in this case. (Doc. 129 at ¶ 3.) It argues that plaintiff seeks to add Wealth Quarterback as a plaintiff now to avoid issues raised in defendant's motions for summary judgment. (*Id*. at ¶ 6.) It contends that it directed its discovery toward plaintiff JAG, not Wealth

Quarterback, so adding Wealth Quarterback as a plaintiff would be highly prejudicial and would lead to significant and costly delay. (*Id.* at ¶¶ 10, 20.)[1]

In reply, plaintiff JAG emphasizes that the parties have consistently treated Wealth Quarterback as part of the litigation. (Doc. 138 at 1-2.) It argues that its response to defendant's request for admission, which stated that Wealth Quarterback was not a party in this case, was appropriate because Wealth Quarterback is a division of plaintiff JAG. (*Id.* at 2.) Lastly, it contends that defendant has received discovery from Wealth Quarterback and questioned Josh Jalinski regarding Wealth Quarterback during his deposition. (*Id.* at 3.)

Before trial, a party may amend its pleadings with the court's leave "when justice so requires." Fed. R. Civ. P. § 15(a)(2). "Rule 15 does not specifically address whether a party may join additional parties by amending a complaint," but "courts regularly allow parties to add or drop parties by amending a complaint under Rule 15." *In re Genetically Modified Rice Litigation*, No. 4:06MD1811 CDP, 2010 WL 3522301 at *1 (E.D. Mo. Sep. 2, 2010) (collecting cases).

Plaintiff JAG has established that it provided discovery with respect to Wealth Quarterback and that the parties treated Wealth Quarterback as a party to the litigation. It has also stated that the jury would make joint findings as to damages, and it would call the same witnesses as to both entities. (Doc. 154 at 7:8-14, 14:5-8.) Defendant has not shown that it will be prejudiced if Wealth Quarterback is added to this case as a plaintiff. The Court therefore grants plaintiff's motion to amend the first amended complaint to add Wealth Quarterback as a plaintiff.

## MOTION TO STRIKE

The Court turns next to defendant's motion to strike, as the outcome determines the evidence before it when considering defendant's motions for summary judgment. Defendant seeks to strike and exclude exhibits filed by plaintiff in its opposition to summary judgment, contending that the exhibits were not disclosed or produced in discovery. (Doc. 130-1 at 2.) It identifies plaintiff's exhibits Docs. 124-3 through 124-6, 124-12, 124-17, and 124-21 through 124-38 as new

---

[1] Defendant asserted in its response that plaintiff JAG failed to produce Wealth Quarterback's financial documents, including profit and loss statements, during discovery. (Doc. 129 at ¶¶ 17-19.) It later corrected its assertion, acknowledging that it received profit and loss statements for Wealth Quarterback after the close of discovery. (Doc. 143.)

factual exhibits. (*Id*. at 3.)[2] Specifically, defendant argues that Doc. 124-12, an affidavit by Josh Jalinski, is an untimely effort by plaintiff to "fill in the gaps" of incomplete discovery responses and create controverted facts in opposition to summary judgment. (*Id*. at 3-4.)

In response, plaintiff argues that defendant's motion to strike is procedurally improper. (Doc. 139 at 2.) It contends that defendant alluded to but failed to specifically identify any discovery requests to which plaintiff failed to respond. (*Id*. at 3.) It contends that the exhibits identified by defendant were either exchanged during discovery or were not within plaintiff's custody or control and were otherwise publicly available. (*Id*. at 5, 7.)

"The power of the trial court to exclude exhibits and witnesses not disclosed in compliance with its discovery and pretrial orders is essential to the judge's control over the case." *Sellers v. Mineta*, 350 F.3d 706, 711 (8th Cir. 2003) (citations and internal quotations omitted). A party must provide "a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses . . . ." Fed. R. Civ. P. 26(a)(1)(A)(ii). "If a party fails to disclose information or identify a witness as required by Rule 26(a) or (e), the party shall not be permitted to use [the nondisclosed information as] evidence on a motion, at a hearing, or at trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Defendant specifically challenges Doc. 124-12, an affidavit by Josh Jalinski and two supporting exhibits, as untimely produced. Fed. R. Civ. P. 56(c)(1)(A) provides that a party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including . . . affidavits or declarations, stipulations (including those made for the purposes of the motion only) . . . ." Other than its contention that Mr. Jalinski's affidavit was untimely because it was produced after the close of discovery, defendant does not argue that the affidavit is contrary to Rule 56. The Court notes that many of the assertions in Mr. Jalinski's affidavit are duplicative of those present in the parties' joint statement of material facts. (*See* Doc. 120.) The Court therefore declines to strike Doc. 124-12.

The Court finds that many of the exhibits identified by defendant as "new facts" are duplicative of prior filings, of documents filed by defendant, or of documents otherwise provided

---

[2] In its memorandum, defendant identifies the exhibits as A-D, J, O, and S-JJ. For the sake of clarity and consistency, the Court refers to the exhibits according to their "Doc." identifications in CM/ECF.

by plaintiff during discovery.   Plaintiff's Docs. 124-22 through 124-25 are its trademark registrations, which were attached to its complaint.  (See Docs. 12-1 through 12-4.)  Plaintiff's Doc. 124-38 is duplicative of defendant's Doc. 127-21.  Plaintiff's Doc. 124-4 is duplicative of defendant's Doc. 67-2.  Docs. 124-3, 124-5, and 124-6 are similar Wayback Machine screen captures of defendant's website.  Considering that defendant also submitted Wayback Machine screen captures in support of its motion for summary judgment, the Court finds that Docs 124-3 through 124-6 were equally within the custody and control of both parties.  Plaintiff contends that it produced Docs. 124-17, 124-21, and 124-26 to defendant during discovery.  (Doc. 139-1 at ¶¶ 3-5.)  It also contends that Doc. 124-35 is an excerpt of defendant's own document, provided to plaintiff during discovery, and that Doc. 124-36 was provided to plaintiff during Erin Lapidus's deposition testimony on February 4, 2021.  (Doc. 139 at 6.)

Docs. 124-29 through 124-33 and 124-37 are referenced in the parties' joint statement of uncontroverted material facts.  (*See* Doc. 120 at ¶ 31p-31t.)  The remaining exhibits – Docs. 124-27, 124-33, and 124-34 – are screen captures of publicly available websites.  Defendant does not argue with specificity that plaintiff failed to produce these exhibits in response to a discovery request.  Therefore, the Court, having reviewed the exhibits at issue, denies defendant's motion to strike and exclude.

## MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party."  *Shrable v. Eaton Corp.*, 695 F.3d 768, 770 (8th Cir. 2012); *see also* Fed. R. Civ. P. 56(a).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A dispute is genuine if the evidence may prompt a reasonable jury to return a verdict for either the plaintiff or the defendant, and it is material if it would affect the resolution of a case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252 (1986); *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010 (8th Cir. 2011).

The burden shifts to the non-moving party to demonstrate that disputes of fact do exist only after the movant has made its showing.  *Id.*  It is the nonmoving party's burden to set forth affirmative evidence and specific factual support by affidavit and other evidence to avoid summary judgment.  *Perry v. Martin*, 2013 WL 6331474, at *1 (E.D. Mo. Dec. 5, 2013).  If reasonable

- 14 -

minds could differ as to the import of the evidence, then summary judgment is not appropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).  Also, pursuant to Local Rule 4.01(E), the movant's statement of uncontroverted material facts is deemed admitted unless specifically controverted by the opposing party.

Defendant has moved for summary judgment on four grounds: no likelihood of confusion (Doc. 89); superior common law rights in "Retirement Coach" (Doc. 90); exclusion of damages claimed by Wealth Quarterback and Josh Jalinski (Doc. 91); and non-infringement of U.S. Registration No. 3782665 (Doc. 93).

### Trademark Infringement

"To prove a trademark infringement claim, a plaintiff must show that it has a valid, protectible mark and that there is a likelihood of confusion between its mark and the defendant's mark." *B & B Hardware, Inc. v. Hargis Industries, Inc.*, 569 F.3d 383, 389 (8th Cir. 2009) (citations omitted).  Under the Lanham Act, registration of a trademark is "prima facie evidence of the validity of the registration, the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate of registration."  *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987).

Plaintiff JAG currently owns the trademarks "The Financial Quarterback" and "Financial Quarterback" under four different registration numbers: 4722740, 5346563, 5633102, and 5346562.  SOF ¶¶ 17a-b.  Plaintiff is also the owner of the "The Financial Quarterback" trademark under registration number 3782665, which is identified by the U.S. Trademark Office as being "cancelled" and "dead" due to plaintiff's voluntary abandonment of the registration.  SOF ¶¶ 18-20a.

"The plaintiff mark owner has the burden of 'showing that the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'"  *ZW USA, Inc. v. PWD Systems, LLC*, 889 F.3d 441, 446 (8th Cir. 2018) (citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004)).  Likelihood of confusion is a finding of fact.  *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 934 (8th Cir. 2021). To assess likelihood of confusion, the Eighth Circuit "employs a list of nonexclusive factors for addressing a core inquiry: whether the relevant average consumers for a product or service are

likely to be confused as to the source of the product or service or as to an affiliation between sources based on a defendant's use." *Id*. at 933.  When determining whether likelihood of confusion exists, the Court considers the following factors: (1) strength of the mark; (2) similarity of the marks; (3) competitive proximity; (4) the alleged infringer's intent to confuse the public; (5) evidence of actual confusion; and (6) the degree of care expected of the plaintiff's potential customers.  *Squirt Co. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

The Eighth Circuit has stated that likelihood of confusion "is particularly amenable to resolution by jury, which represents a cross-section of consumers and is well-suited to evaluating whether an ordinary consumer would be confused." *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 760 (8th Cir. 2005) (citations omitted) (cleaned up).  "For purposes of summary judgment, 'factual disputes regarding a single factor' could, but do not necessarily, preclude summary judgment." *Connectone Bancorp Inc. v. Star City Bancshares Inc.*, Case No. 5:19-cv-00159-LPR, 2020 WL 8175596 at *4 (E.D. Ark. Dec. 11, 2020) (citing *ZW USA, Inc.*, 889 F.3d at 446).

Plaintiff has made inconsistent arguments regarding the scope of its trademark infringement claims.  In its brief in opposition to summary judgment, plaintiff states that there is "likelihood of confusion as a result of [defendant's] tainted use of 'retirement coach' alone . . ." (Doc. 124 at 22.)  In oral argument, though, plaintiff's counsel stated that "this case is not about a comparison between Retirement Coach and Financial Quarterback."  (Doc. 154 at 41:13-14.)  Rather, "[t]he confusion relates to [defendant's] use of Financial Quarterback in combination with Retirement Coach, with visual perceptions that relate to their radio broadcasts."  (*Id*. at 42:7-9.)  For the sake of complete analysis, the Court analyzes under the *Squirt Co* factors both the use of "Retirement Coach" alone and the combined use of "Retirement Coach" and "Financial Quarterback."

Strength of the Mark

"A strong and distinctive mark is entitled to greater protection than a weak or commonplace one." *Id*.  "A term for which trademark protection is claimed will fall in one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." *Frosty Treats Inc. v. Sony Comput. Ent. Am. Inc.*, 426 F.3d 1001, 1004 (8th Cir. 2005) (citing *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1325 (8th Cir. 1984).  "A generic mark refers to the common name or nature of an article,

and is therefore not entitled to trademark protection." *Id*. at 1005 (citations omitted).  "A term is descriptive if it conveys an immediate idea of the ingredients, qualities or characteristics of the goods, and is protectible only if shown to have acquired a secondary meaning." *Id*. (citations omitted).  "Suggestive marks, which require imagination, thought, and perception to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks, are entitled to protection regardless of whether they have acquired secondary meaning." *Id*.

The phrase "financial quarterback" has been used in newspaper and magazine advertisements by various banks and other institutions, but it was not used continuously or consistently and was not previously used as a brand name for financial services.  SOF ¶ 150b. Defendant argues that past use in the financial sector renders the "financial quarterback" mark as either generic or descriptive and therefore weak as a trademark.  "Financial quarterback," though, does not necessarily convey an immediate idea of the ingredients, qualities, or characteristics of the goods or services offered by plaintiff.  It may not be immediately clear from the mark itself what kinds of services plaintiff offers but rather may require imagination, thought, and perception to conceive of the services that plaintiff provides.  Reasonable fact finders could differ in their understanding of the strength of plaintiff's mark, so there is a genuine dispute of material fact as to the strength of plaintiff's mark.

<u>Similarity of the Marks</u>

"Similarity is based on an examination of the marks as a whole, including visual impression and sound." *SquirtCo.*, 628 F.2d at 1091.  The Court "may consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999).  "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." *General Mills*, 824 F.2d at 627 (quoting *Freedom Sav. And Loan Ass'n v. Way*, 757 F.2d 1176, 1183 (8th Cir. 1985)).

The parties agree that the terms "Retirement Coach" and "Financial Quarterback" are spelled differently.  SOF ¶ 97a.  There is little overlap in their aural attributes.  The terms also have distinct definitions, though they both invoke a sports motif.  SOF ¶¶ 99a, 101b, 102a.  Generally, a "coach" plans, organizes, trains, and instructs the players of a sports team, while a "quarterback" directs the offense of a football team and may otherwise train and instruct other players.  SOF ¶¶

101a, 102a.  While some overlap exists between the roles of coach and quarterback in training and instructing players, the roles of coaches and quarterbacks are generally distinct in the functioning of a football team.

Turning to trade dress, the term "Retirement Coach" appears at the top of defendant's newsletter in a dark gray or black italicized font.  (Docs. 64-2 at 1, 64-3 at 1.)  On defendant's website, "Your Retirement Coaches" appeared in dark green font in the middle of the page, with "quarterback" appearing in significantly smaller font at the end of the second paragraph on the page.  (Doc. 124-5 at 3.)

On plaintiff's website, "The Financial Quarterback" appears in a paragraph of text promoting plaintiff's services.  (Doc. 124-21 at 2.)  "The Financial Quarterback" is written in the same font as the rest of the text but contains "TM" in superscript, indicating its status as a trademark.  (*Id*.)  The website's color scheme includes black, white, and gold.  (*Id*.)  It does not include any photos or graphics in a sport motif.  (*Id*.)  On Josh Jalinski's Twitter account, "The Financial Quarterback" appears at the top of the page; the mark is capitalized in bold white font, and it is superimposed over an image of a football and field.  (Doc. 124-26.)

Overall, neither "Retirement Coach" nor "Financial Quarterback" has distinctive trade dress.  Both marks differ in their appearance depending on their locations, with different color schemes and lettering styles and no overarching designs.  *See General Mills*, 824 F.2d at 627.  There are no genuine disputes of material fact as to the similarity of "Retirement Coach" and "Financial Quarterback."

In addition to arguing that the terms themselves are confusingly similarly, plaintiff asserts that defendant's use of the "Retirement Coach" phrase in conjunction with "Financial Quarterback" and a sport and/or football motif creates a likelihood of confusion.  (Doc. 124 at 22-23.)  Defendant used the phrase "Financial Quarterback" in two identical social media posts on April 2, 2018, with one post on Facebook and one on Twitter.  (Doc. 124-36 at 2-3.)  The posts, as well as three other posts cited by plaintiff that do not contain the words "financial" or "quarterback," included photos of football players.  (*Id*. at 2-6.)  A May 7, 2017 Facebook post contained the tags "#finance" and "#quarterbacks."  (*Id*. at 2.)

Screen captures from defendant's website as of October 2016 and July 2017 show that the defendant described itself as "coach, quarterback, and adviser" for clients.  (Doc. 124-5 at 3; Doc. 124-20 at 3; Doc. 67-4 at 4.)  The phrase appears at the end of the second paragraph on a page that

contains three paragraphs describing defendant's services and operating philosophy.  (*Id.*)  The font used for the phrase is the same as that of the rest of the text on the page.  (*Id.*)

Screen captures from October 2017, April 2018, and January 2019 show that defendant's website included the sentence "We pride ourselves on being your financial quarterbacks."  (Doc. 67-4 at 1-3.)  The sentence appears in the top right of a four-panel square under the heading "Serving Individuals."  (*Id.*)  Contrary to plaintiff's assertion, "financial quarterbacks" is not in a larger font than other text on the page.  Rather, it is in the smallest text size used on the page.  (*Id.*)  The top of the page features a separate box with the heading, in large green font, "Your Retirement Coaches."  (*Id.*)

Defendant's uses of plaintiff's "financial quarterback" and "quarterback" marks in conjunction with "Retirement Coach" are insufficient to create a genuine issue of material fact.  Neither party consistently used "Financial Quarterback" in conjunction with a sport and/or football motif.  The mark appears on Josh Jalinski's Twitter account in a football motif, and defendant used the mark in two posts on the same day in conjunction with a football motif.  Though both parties used the mark on their websites in the body of other text, plaintiff identified it as a trademark and defendant did not.  After analyzing the parties' uses of the marks, including trade dress, the Court concludes that the total effect conveyed by their respective uses are not confusingly similar.

### Competitive Proximity

"Competitive proximity is one factor to be considered, even though infringement may be found in the absence of direct competition."  *SquirtCo.*, 628 F.2d at 1091.  "If the two companies' products are closely related, confusion among customers is more likely."  *Sensient Tech. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010).  "Products are in competitive proximity when there is similarity or overlap in their sales outlets, trade channels, and customers."  *Roederer v. J. Garcia Carrion, S.A.*, 732 F.Supp.2d 836, 868 (D. Minn. 2010).

It is undisputed that plaintiff's and defendant's products are closely related, as they both provide financial services.  SOF ¶¶ 1i, 35.  The vast majority of defendant's clients, 406 of 683, reside in Missouri and Illinois; defendant has no clients in New Jersey, New York, or Pennsylvania.  SOF ¶¶ 85, 86.  Defendant has some clients in states where plaintiff has a presence, including Massachusetts, Texas, and Florida.  SOF ¶¶ 87a, 87b.  The territorial reach of plaintiff's radio program, which it uses to generate leads, includes New York, New Jersey, Pennsylvania, the

Midwest, Washington, D.C., North Carolina, Virginia, Massachusetts, Vermont, and Maine.  SOF ¶ 94f, 111k.  Plaintiff has received calls from Missouri and Illinois and has one client in Sunset Beach, Missouri.  SOF ¶¶ 82, 90e.

Defendant contends that the broadcast ranges of the parties' respective radio programs, as well as the geographic distribution of their clients, shows very little competitive proximity between the parties.  (Doc. 110 at 14-15.)  Plaintiff argues that its marketing reaches the Midwest, and the almost complete dearth of client leads in the Missouri marketplace is evidence of confusion.  (Doc. 124 at 10, 13.)  It also contends that, though its radio programming is not available on St. Louis-based terrestrial radio, it has reason to believe that its New York-based radio programming reaches into the Midwest.  SOF ¶¶ 88a, 88b.  It emphasizes that defendant's website and social media posts are available nationwide via the internet.  (*Id*. at 28.)  It also notes the prominence of the financial services industry in St. Louis, as well as the significant amount of travel between St. Louis and New York.  (*Id*.)

Plaintiff asserts that St. Louis is one of the wealthiest markets in the country and that it includes three of the wealthiest suburbs in the United States.  SOF ¶ 31o.[3]  The Court concludes that the relative wealth of the St. Louis market is not a material fact in this case.  Whether plaintiff would like to compete in the St. Louis market is not relevant to the competitive proximity analysis.  Rather, there must be similarity in their actual sales outlets, trade channels, and customers.  *See Roederer*, 732 F.Supp.2d at 868.  The Court also concludes that the amount of travel between St. Louis and New York is not a material fact.  Plaintiff has not proffered any evidence of St. Louis travelers accessing plaintiff's radio programming or encountering its advertising while in New York.  Its assertion that travelers "would have access to [plaintiff's] Radio Program while in the area" is speculative and not a material fact precluding summary judgment.  (Doc. 124 at 28.)

However, there are genuine disputes of material fact as to the reach of plaintiff's marketing into the Midwest.  Between January 19, 2020, and November 27, 2021, eight Missouri residents and thirty-one Illinois residents purchased Mr. Jalinski's book, *Retirement Reality Check*, which "was also a part of the branded effort for leads under the Financial Quarterback Marks."  (Doc.

---

[3] Plaintiff's counsel asserted during oral argument that St. Louis "has the third most wealthy people in the United States," which is not supported by the record.  (Doc. 154 at 39, 40.)  Appended to Josh Jalinski's report was a news article stating that three of America's twenty-five wealthiest suburbs are in St. Louis.  (Doc. 124-13 at 17.)

124-12 at 2, 9-20.)  Between January 1 and December 5, 2021, plaintiff's Facebook posts, which "always us[e] the Financial Quarterback marks," reached 36,347 users in Missouri and 68,087 users in Illinois.  (*Id*. at 3, 22.)  Defendant also advertises on Facebook, as indicated by the allegedly infringing posts.  (Doc. 124-36.)  The facts proffered by plaintiff are sufficient to create a genuine dispute as to the similarity or overlap of the parties' marketing channels and customers. Whether plaintiff's marketing efforts create competitive proximity with defendant in the St. Louis area, defendant's primary market, is a genuine issue of material fact.

Alleged Infringer's Intent to Confuse the Public

"Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement."  *SquirtCo.*, 628 F.2d at 1091.  The parties agree that there is no evidence that defendant was aware of plaintiff prior to the filing of this action.  SOF ¶ 147a.  Plaintiff contends that defendant may have been aware of plaintiff, as defendant's president and vice president are registered investment advisor representatives with Private Advisor Group, which is located in New Jersey.  (Doc. 124 at 38-39.)  "Knowledge of another's product and an intent to compete with that product is not, however, equivalent to an intent" to mislead and to cause consumer confusion. *General Mills, Inc.*, 824 F.2d at 627.  Even if defendant were aware of plaintiff and its mark, such awareness and intent to compete is not sufficient to establish defendant's intent to confuse the public, so there is no genuine issue of material fact as to this factor.

Evidence of Actual Confusion

"[A]ctual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion."  *SquirtCo.*, 628 F.2d at 1091.  The *SquirtCo* court noted that a response of 25% of a survey sample that two products were made by the same company was sufficient to support an inference of likelihood of confusion.  *Id*.

There is no evidence in the record showing actual consumer confusion.  A survey conducted by plaintiff's expert, Rob Wallace, found that 57.5% of survey respondents and 49% of control respondents thought that the podcasts, social media posts, and websites were produced by the same company or affiliated companies.  (Doc. 126-4 at 15, 17.)  The first survey question exposed respondents to "The Financial Quarterback" and "Your Retirement Coach" in random

order.  (*Id*. at 9.)  Next, respondents saw "excerpts from social media posts" that said, "We pride ourselves on being your financial quarterbacks" and "Win your financial game with Financial Quarterback."  (*Id*. at 10.)  Lastly, the survey exposed respondents to website screen shots that showed defendant's use of "Retirement Coach" in conjunction with "financial quarterback," as well as a screen shot of plaintiff's website with the heading "Meet the Financial Quarterback." (*Id*. at 10-11.)

Defendant disputes the validity of the survey.  (Doc. 75.)  For the reasons discussed *supra*, the Court will not exclude the Wallace survey.  Because the results of the Wallace survey indicate that 57.5% of survey respondents thought that the marketing products were produced by the same company or affiliated companies, there is a genuine issue of material fact as to actual confusion when defendant uses "financial quarterback."

However, the survey evidence does not establish a genuine issue of material fact as to defendant's use of "Retirement Coach" on its own.  Two of the three parts of the survey show defendant's use of "financial quarterback" on its own or in conjunction with "Retirement Coach." The survey does not measure the likelihood of confusion when defendant uses only "Retirement Coach."  Plaintiff is therefore unable to point to a genuine issue of material fact as to actual confusion regarding "Retirement Coach" when used on its own.

<u>Degree of Care Expected of Plaintiff's Potential Customers</u>

"In a trademark infringement action[,] the kind of product, its cost and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist."  *SquirtCo.*, 628 F.2d at 1091 (citations omitted).  Also relevant is the theory of initial-interest confusion, which is "confusion that creates initial consumer interest, even though no actual sale is completed as a result of the confusion."  4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 23:6 (5th ed. 2022).  The Eighth Circuit's general adoption of the initial-interest theory in *Select Comfort* "forecloses summary judgment where a question of fact exists as to the level of consumer sophistication."  996 F.3d at 936.

Wealth Quarterback provides advisory services to individuals with high net worth, as well as retirees and individuals in the middle class.  SOF ¶¶ 6b, 6d.  The leads that plaintiff obtains through its radio program tend to be financially unsophisticated.  SOF ¶ 200c.  Wealth Quarterback

also provides services to charitable organizations and pension and profit-sharing plans.  SOF ¶ 6b. It generally uses a multi-step process to develop a lead into a client, including one or more meetings, but the process varies depending on the client.  SOF ¶ 200b.  Defendant similarly uses a multi-step process in obtaining new clients, from an initial phone call to a visit or "coaching session" with defendant's president or vice president.  SOF ¶ 199.

Wealth Quarterback serves both sophisticated and unsophisticated clients.  Both Wealth Quarterback and defendant use multi-step processes to develop a lead into a client, but the length of the process varies depending on the client.  Additionally, plaintiff contends, and defendant disputes, that defendant updated the metadata for its website, causing it to appear at or near the top of internet search results for "financial quarterback" and "St. Louis."  SOF ¶ 79d.  Plaintiff argues that the search results may have led to initial-interest confusion.  There are genuine issues of material fact as to consumer sophistication and the degree of care expected of the parties' potential customers.

### Conclusion as to Trademark Infringement

The Court, having carefully considered the evidence in the light most favorable to plaintiff, concludes that genuine issues of material fact exist as to several factors where defendant used "financial quarterback."  The Court therefore denies defendant's motion for summary judgment as to trademark infringement where "retirement coach" is used in conjunction with "financial quarterback."  To the extent plaintiff argues that defendant's use of "Retirement Coach" on its own infringes on plaintiff's "Financial Quarterback" mark, the Court grants defendant's motion for summary judgment.

### *Defendant's Common Law Rights to "Retirement Coach"*

Defendant argues that it was the first to adopt its "Retirement Coach" mark as a source identifier, adopting it as early as July 2004 and using it continuously in the St. Louis area since then. (Doc. 110 at 19.)  It contends that plaintiff did not adopt and begin to use its mark until 2006, and even then only in New Jersey and New York. (*Id*. at 10.)  Defendant also argues that it is the senior user of its mark on radio stations and via internet streaming. (*Id*. at 17-18.)

Plaintiff argues that defendant has no rights to either "Retirement Coach" or "Financial Quarterback," as defendant has used "Retirement Coach" inconsistently and has not used it as a

- 23 -

source identifier.  (*Id*. at 22.)  It asserts that defendant's uses of "Retirement Coach" before 2015 were not trademark uses because they were sporadic and inconsistent, and they violated another party's federal trademark rights.  (*Id*. at 23.)

In reply, defendant argues that plaintiff's claim on national reach is not supported by evidence.  (Doc. 132 at 5.)  It asserts that it has common law trademark rights in "Retirement Coach," and plaintiff's assertions to the contrary are paradoxical.  (*Id*. at 7.)

"A common-law trademark arises from the adoption and actual use of a word, phrase, logo, or other device to identify goods or services with a particular party."  *First Bank v. First Bank System, Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996) (citations omitted).  To succeed on a claim of a common law trademark, the alleged owner must prove (1) that it actually used the mark in connection with its goods or services in the relevant markets, and (2) that the mark identified the alleged owner as the provider of those goods or services in the minds of consumers.  *Id*.

Defendant has proffered evidence sufficient to show that it used "Retirement Coach" in connection with its goods and services and that the mark identified defendant as the provider of those goods and services in the minds of consumers.  As early as 2004, defendant used "Retirement Coach" prominently at the top of its newsletter.  (Docs. 61-2, 61-2, 62-1, 62-2, 62-3, 63-1, 63-2, 63-3, 64-1, 64-2, 64-3, 64-5.)  It is undisputed that from 2005 to the present, defendant has regularly conducted a radio show, with defendant's president identifying himself as "Jeff Lapidus, the Retirement Coach."  SOF ¶ 159a.  The Court, having considered the evidence, concludes that no genuine issues of material fact remain as to defendant's common law trademark rights as to "Retirement Coach."

Plaintiff's argument that defendant has no common law rights to "Retirement Coach" because its use infringes on the rights of a third party is unavailing.  The owner of a registered mark has the right to expand its use into a new market unless an infringing user had penetrated that market prior to registration.  *Nat'l Ass'n for Healthcare Communications, Inc. v. Cent. Ark. Area Agency on Aging, Inc.*, 257 F.3d 732, 735 (8th Cir. 2001) (citations omitted).  While it is undisputed that a third party owns the federal registration to "The Retirement Coach," and defendant does not have a license to use the mark, the fact of the other registration and plaintiff's alleged infringement is not material in this case.  The Court grants defendant's motion for summary judgment as to defendant's common law trademark rights.

- 24 -

### *Damages Alleged by Wealth Quarterback*

In accordance with the Court's grant of plaintiff's motion to amend, *supra*, it denies defendant's motion for summary judgment as to the damages alleged by Wealth Quarterback.

### *Trademark Infringement as to U.S. Registration No. 3782665*

Defendant asserts that plaintiff's earliest registration, No. 3782665 ("No. '665"), was cancelled by the U.S. Patent and Trademark Office on December 4, 2020. (Doc. 93 at ¶ 4.) It therefore moves for summary judgment on plaintiff's claims of trademark infringement as they relate to No. '665. (*Id.*) Plaintiff argues that it decided not to renew No. '665 because it was duplicative of another mark it owned, but its common law rights in the mark remain. (Doc. 124 at 19.) Defendant argues in reply that the only common law rights attached to No. '665 would be within Florida, as plaintiff obtained No. '665 from a third party that used the mark primarily in that state. (Doc. 132 at 12.)

"Even if a registration is cancelled, the underlying common law rights in a mark continue." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:18; *see also Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010) ("cancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights.")

In addition to its rights in Florida, plaintiff may have common law rights to "Financial Quarterback" in New York and New Jersey, where it first began using the mark. Even assuming that plaintiff has common law rights to the mark in Florida, New York, and New Jersey, plaintiff has not proffered evidence of common law rights in the markets relevant in this case, i.e. Missouri and Illinois. Plaintiff asserts that, as a result of its radio programs, streaming, and social media marketing. it has a nationwide audience that includes Missouri. (Doc. 124 at 25.) However, it has not provided evidence that the "The Financial Quarterback" mark identified plaintiff as the provider of financial services in the minds of consumers in Missouri and Illinois. *See First Bank*, 84 F.3d at 1044. The Court therefore grants defendant's motion for summary judgment as to plaintiff's claims of trademark infringement for U.S. Registration No. 3782665.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the motions of defendant JBL Financial Services, Inc. for summary judgment as to its superior common law rights in "Retirement Coach" **(Doc. 90)** and non-infringement of U.S. Registration No. 3782665 **(Doc. 93) are granted.**

**IT IS FURTHER ORDERED** that the motion of defendant for summary judgment as to likelihood of confusion **(Doc. 89) is granted in part and denied in part.**  Defendant's motion is granted as to its use of "Retirement Coach" alone.  It is otherwise denied.

**IT IS FURTHER ORDERED** that the motion of defendant for summary judgment as to the damages alleged by Wealth Quarterback **(Doc. 91) is denied.**

**IT IS FURTHER ORDERED** that the motion of defendant JBL to bar the testimony and opinion of plaintiff's expert Robert Gering **(Doc. 80) is granted.**  Defendant's other motions to exclude plaintiff's experts **(Docs. 74 and 78) are denied.**

**IT IS FURTHER ORDERED** that the motion of plaintiff JAG to amend its amended complaint **(Doc. 123) is granted.**

**IT IS FURTHER ORDERED** that the motion of defendant to strike and exclude for sanctions **(Doc. 130) is denied.**


_____/s/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on April 20, 2022.